# THE STATE v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

### In Banc, April 13, 1909.

1. **INDICTMENT: Particular Act: Proof: Limitations.** One indicted for committing an act in violation of law on a certain day may be convicted if it be proven that he committed the act specified in the indictment on any day within the period of limitation prescribed for prosecution of the act. But if he is indicted for committing a certain act on a certain day, and the State's proof is that he did the act specified on the day specified, the State has no right to go back over the period of the Statute of Limitations and prove that he did similar acts on other days. The day specified in the indictment, if it be within the statutory period, is, ordinarily, not a vital point to be proven, but the act it is charged defendant committed is vital. So that where defendant was charged with failure to run a passenger train both ways on its railroad on February 14th, 1908, in violation of the statute, and the State proved that, on February 14th, 1908, the defendant ran, both ways on its railroad, a train composed of an engine, tender, two or more freight cars, a combined baggage, mail and passenger coach, and that no other train was run on that day, it was not proper to permit the State to go back over a period of six months and prove what kind of trains defendant ran on other days during that period, or to prove the delay in the arrival and departure of some of those trains.

2. **Passenger Train: Term Used in Title and Body of Act.** The words "passenger train" used in the title of the Act of March 19, 1907, and the words "regular passenger train" used in the body of the act, must be held to mean one and the same thing. If the Legislature by the use of the words "regular passenger train" in the body of the act meant to call for a train of different construction or composition from that termed in the title a "passenger train," then the act expressed a different purpose from its title, which the Constitution forbids.

3. **REGULAR PASSENGER TRAIN.** There is no recognized technical definition of the words "regular passenger train," nor do those words have any technical meaning, nor are they defined by the Act of March 19, 1907, Laws 1907, p. 180, requiring all railroads to run "one regular passenger train each way every day over all lines," etc.

4. ———: **What Is?**  A regular train does not mean a train uniform in its make-up, but a train running regularly on a prescribed published schedule.

5. ———: **Containing Freight Cars.**  A train composed of an engine, tender, two freight cars, a combined baggage-mail-and-passenger car, and a passenger coach, run on regular schedule time and stopped at all the regular stations to receive and discharge passengers, is a "regular passenger train" within the meaning of the Act of March 19, 1907, requiring a railroad to "run at least one regular passenger train each way every day over all lines," and a railroad company which ran such a train on the particular day charged did not on that day violate that statute.

6. ———: **On Sunday: Constitutional Question.**  And the defendant railroad company having been shown by the State's evidence to have run such a train as the statute requires on the Sunday named, the court will not consider whether its religious liberty is impaired by the statute requiring it to run such a train on Sunday. Before defendant can have that question decided, it must take off its Sunday train, and incur the wrath of the State for so doing.

Appeal from Benton Circuit Court.—*Hon. C. A. Denton*, Judge.

REVERSED.

*Roy D. Williams* and *C. D. Corum* for appellant; *Sam. B. Jeffries* of counsel.

(1) The Act of March 19, 1907, under which defendant was prosecuted, is unconstitutional, in that it is special and class legislation. The only purpose of a statute of this character is the accommodation of the traveling public. The necessity for such a law, if there be any at all, is to accommodate the public by furnishing ample facilities for travel "every day", including Sunday. The business, then, to be legislated upon, is the regular conveyance of passengers, regardless of whether it be by railroad, trolley car, steamboat, ferry or stage coach. The purpose of the act being to regulate the business of persons and corporations, engaged in carrying passengers for hire, and to make sure, to

the public, proper traveling accommodations each day in the week, the act should include by its terms all persons and corporations so engaged regardless of the means or facilities employed by them in the conduct of their business.  People ex rel. v. Golter, 149 Ill. 39; State ex rel. v. Miller, 100 Mo. 448; Murnane v. St. Louis, 123 Mo. 491.  The governing rule in the construction of statutes of this character is that a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of that class is a special law.  State ex rel. v. Herrmann, 75 Mo. 354; Dunne v. Railroad, 131 Mo. 5; Eden v. People, 161 Ill. 296; Ex parte Jentzsch, 112 Cal. 468.  (2) The act requiring railroads to operate on Sunday for the purpose of carrying passengers violates section 1 of the fourteenth amendment to the Constitution of the United States, in that it denies defendant the equal protection of the law by exempting therefrom other persons and corporations engaged in the business of public carriers of passengers. By confining the application of the act to steam railroads, the Legislature violated the plain terms of the Federal Constitution, by arbitrarily and unjustly discriminating against such roads, and without reasonable grounds therefor.  8 Cyc. 1063; Sams v. Railroad, 174 Mo. 53; State ex inf. v. Washburn, 167 Mo. 689; State v. Walsh, 136 Mo. 400; State v. Thomas, 138 Mo. 95; State ex rel. v. Ashbrook, 154 Mo. 375; State v. Loomis, 115 Mo. 314; In re Flukes, 157 Mo. 132.  (3) The act is violative of section 5, article 2, of the Constitution of Missouri in that it deprives citizens of this State of their natural and indefeasible right to worship Almighty God according to the dictates of their own conscience.  The statute, by the use of the words "every day" includes Sunday, and makes it compulsory on persons and corporations operating railroads to labor on Sunday, regardless of the religious convictions of such persons or the employees of such corporations.  State v. Ambs,

20 Mo. 214; State v. McBride, 4 Mo. 303; Murnane v. St. Louis, 123 Mo. 479; State v. Loomis, 115 Mo. 307; Bloom v. Richards, 2 Ohio St. 387; State v. Nichols, 28 Wash. 628; People v. Havnor, 149 N. Y. 195; St. Louis v. DeLassus, 205 Mo. 585. (4) Defendant is shown by the evidence to have complied with the Act of March 19, 1907. Zulich v. Bowman, 42 Pa. 83; Meyer v. Rashback, 4 How. Pr. 83. The General Assembly is presumed to legislate in the light of, and with reference to, statutes already passed by it. Sec. 1011, R. S. 1899; Railroad v. People, 143 Ill. 434. "Regular" means constant, fixed, and not temporary. Board v. Williams, 53 Atl. 924; Land v. Wilmington, 10 S. E. 82; State ex rel. v. Leffingwell, 54 Mo. 458; Spitler v. Young, 63 Mo. 42. Words and phrases must be taken in their plain, ordinary and usual sense. Coatsworth Company v. Evans, 97 Mo. 47; State ex rel. v. Fisher, 119 Mo. 344; State v. Miller, 182 Mo. 370; State v. White, 96 Mo. App. 34; State ex rel. v. St. Louis, 174 Mo. 125.

*Elliott W. Major,* Attorney-General, for the State.

The Act of 1907 is reasonable and necessary to the proper public use of railroads, and it applies impartially to all engaged in the railroad business. It is, therefore, constitutional and valid. (a) The use to which railroads are operated is a public use. The people, having an interest in the use, have the right, through the Legislature, to subject the railroads to such reasonable regulations as will promote the objects of their creation and fully accommodate the use to which the roads are applied. State v. Railroad, 83 Mo. 150; 2 Elliott on Railroads (2 Ed.), secs. 662, 663, p. 82, sec. 709; Baldwin's American Railroad Law, 213; Munn v. Ill., 94 U. S. 113; Railroad v. Bristol, 151 U. S. 571; McGowan v. Wilmington, 95 N. C. 417; Railroad v. Ohio, 173 U. S. 285; State v. Railroad, 17 Neb. 647; R. R. Coms. v. Railroad, 63 Maine 269; Gates v. Railroad, 53 Conn. 333; State v. Railroad, 43 Conn. 351;

Smith v. Ames, 169 U. S. 545. (b) It is within the power of the State to compel railroad companies to operate their roads and run daily trains to accommodate the public. Com. v. Railroad, 85 S. W. 712; State v. Railroad, 29 Conn. 538; People v. Railroad, 70 N. Y. 569. (c) There is no unjust discrimination and no denial of the equal protection of the laws, in as much as the law is applicable alike to all "persons, copartnerships, companies or corporations operating any railroad," although not applicable to other corporations or individuals. Hume v. Railroad, 82 Mo. 231; Railroad v. Hume, 115 U. S. 523; State v. Swagerty, 203 Mo. 517; State v. Cantwell, 179 Mo. 245; Baldwin's American Railroad law, pp. 213-217; Grainger v. Jockey Club, 148 Fed. 513. (d) The act in question is presumed to be constitutional until the contrary is clearly shown. State ex rel. v. Aloe, 152 Mo. 477; State ex rel. v. Railroad, 48 Mo. 471; State v. Cantwell, 179 Mo. 261; Atchison v. Andrews, 174 U. S. 96. (e) Sunday trains are necessary in the business of the country, and no constitutional rights of railroads or their employees are violated by requiring reasonable train service for public travel and business on Sunday. Com. v. Railroad, 80 Ky. 291; Carver v. State, 69 Ind. 64; Murray v. Com., 24 Pa. 270; State v. Ames, 20 Mo. 218; Bloom v. Richards, 2 Ohio St. 405.

VALLIANT, C. J.—Defendant was convicted and fined $100 as if for failure to obey the requirement of an Act of the General Assembly approved March 19, 1907 (Laws 1907, p. 180), entitled, "An Act to compel all railroad corporations or persons operating a railroad or part of a railroad in this State to run at least one passenger train over said railroad each way every day, and fixing penalties for violation thereof."

The first section of that act is as follows:

"Section 1.   That all persons, copartnerships, companies or corporations operating any railroad or part of a railroad in this State shall, unless hindered by wrecks or providential hindrance, run at least one regular passenger train each way every day over all lines, or part of line, of railroad so operated by such person, copartnership, company or corporation in this State, which train shall stop at all regular stations along the line of such railroad for the purpose of receiving and discharging passengers."

Section 2 prescribes the penalty of not less than $100 nor more than $500 for each violation.

The information charges that defendant owned and operated a railroad extending from Sedalia to Warsaw, connecting at Sedalia with its main line; that on February 14, 1908, there being no wreck or providential hindrance, defendant did "fail and refuse to operate a regular passenger train each way over" that railroad.   Defendant filed a motion to quash the information on the ground that it charged no offense against the law, because the act of the General Assembly above mentioned, on which the information was based, was unconstitutional in several particulars, specifying in the motion certain clauses in the State and in the Federal Constitution which defendant thought were violated.   The same points were also presented in the motions for a new trial and in arrest of judgment.   It was the constitutional question that brought the appeal to this court, but unless we find in the record evidence sufficient to sustain the court's finding of guilty as charged in the information, we will have to decide the case before we reach the constitutional question.

The information charged the defendant with failure to run a regular passenger train each way on the 14th February, 1908.   One indicted for committing an act in violation of law on a certain day may be con-

victed if it be proven that he committed the act speci-fied in the indictment on any day within the period of limitation prescribed for prosecution of the act. But if he is indicted for committing a certain act on a cer-tain day and the State's proof is to the effect that he did the act specified on the day specified, the State would have no right to go back over the period of the Statute of Limitations and prove that he did similar acts on other days. The day specified in the indict-ment, if it be within the statutory period, is, ordinarily, not a vital point to be proven, but the act which it is charged the defendant committed is vital, and where that act is identified by the State's proof it is the act on which the State must rely for conviction, and unless the facts proven are sufficient to constitute the criminal act charged the State cannot go back or forward over the statutory period and prove other facts that have no connection with the particular act for which the de-fendant is indicted in order to supply what may be lack-ing to render the particular act specified a violation of the law.

The evidence in this case wandered farther than it should. The defendant was charged with having failed to run a regular passenger train both ways on this road on the 14th February, 1908, in violation of the statute, and, to sustain that charge, the State proved that on the 14th February, 1908, the defendant ran, both ways on the road, a train composed of an engine, tender, two or more freight cars, a combined baggage-mail-and-passenger car and a passenger coach, and that no other train was run on that day. That proof was a complete identification of the act specified in the information and a complete identification of the day specified on which it was committed, therefore there was no occa-sion to go over a period of six months, as the State was allowed to do, to prove what kind of trains defendant ran on other days during that period and the delay in the arrival and departure of some of those trains.

It was shown in evidence for the State that there was a schedule for the arrival and departure of the trains, and there was no evidence that this train on this day did not arrive and depart on the schedule time. Defendant was called into court to answer for its conduct in running that train, not to answer why another train six months before was delayed. Here then we have a train equipped with an ordinary passenger coach and also a car divided into compartments, designed to carry baggage in one compartment, mails in another and passengers in another, and the train running on a published schedule as to time, but in addition to those cars the train contained two or more freight cars and that fact alone is what the State relies on to prove that this was not a regular passenger train. The question therefore is, does that train fill the requirements of the Act of 1907, is it a regular passenger train, or, reducing the question to its simplest form, is it a passenger train?

The title to the act does not use the term "regular passenger train", but says it is "an act to compel all railroad corporations . . . to run at least one passenger train over said railroad each way every day," etc. In the body of the act it says "one regular passenger train." We have no right to presume that the Legislature by using the term "regular passenger train" in the body of the act intended to call for a train of a different construction or composition from that mentioned in the title under the term "passenger train," because if we did we would have to say that they intended to express a different purpose in the body than that indicated in the title, which the Constitution forbids. Our task now is to find what the Legislature meant by the use of those terms in the title and in the body of the act. What is a passenger train? What is a regular passenger train? What is the difference in meaning between the two terms, "a passenger train" and "a regular passenger train?" The General Assembly has used those terms, but has not undertaken

to define them, and it has used them in a criminal stat-
ute, rendering the violator of the statute liable, if he
misunderstands its purport or misinterprets its mean-
ing, to a penalty of $100 to $500 a day, and he is liable
to indictment for his conduct each and every day in
which he acts upon his erroneous (though it may be
perfectly honest and not altogether unreasonable) in-
terpretation of the words used in the statute, and thus
in the course of a few months at the rate of $100 to $500
a day the penalties might amount to a considerable
sum. If the General Assembly had intended to require
the railroad company under a heavy penalty to run
each way every day a train composed exclusively of
cars designed for the accommodation of passengers it
would have required no great skill in the use of lan-
guage to have said so and if that was its purpose it no
doubt would have said so. Our statute requires us,
in construing statutes, to interpret "words and
phrases in their ordinary and usual sense, but technic-
al words and phrases having a peculiar and appropri-
ate meaning in law shall be understood according to
their technical import." [Sec. 4160, R. S. 1899, Ann.
Stat. 1906, p. 2252.] The words we are now discussing
have no technical meaning in law and are therefore
to be construed in their ordinary sense, but the diffi-
culty is that there is room for honest and intelligent
differences in opinions as to their ordinary meaning
and the record and briefs in this case show that there
are in fact such differences of opinions. If the term
"passenger train" has any well-established technical
meaning in the parlance of railroad men no proof of
that fact was offered. Some of the State's witnesses
called this "a mixed train," but they did not profess
to speak with authority; it was only the opinion of in-
dividuals, and that too of individuals not especially
qualified to instruct on that subject. The Attorney-
General in his brief says that we must take judicial
cognizance of the meaning of the phrase "regular pas-

senger train.'' But there is no such universal accept-
ance of a definition of that term as will justify us in
saying that such is the law.   Perhaps the term "local
freight'' is in such common use in this State that we
might safely say that it means a train of freight cars
receiving and delivering goods within a limited dis-
tance and carrying at the rear end a caboose for the
accommodation of the train crew and, incidentally, a
few passengers.   But if that is correct, the train in
question in this case was not a "local freight,'' for it
was equipped with an ordinary passenger coach, and a
combined baggage-mail-and-passenger car.   Nor can
we avoid the question by saying this was a "mixed
train,'' because, conceding that it was a mixed train,
as in a certain sense it was, can we say that a train
having cars designed and used only for the carrying
of passengers and their baggage is not a passenger
train because it also has cars designed for freight only?
To try to get rid of it by calling it a mixed train would
be begging the question.

   Words of doubtful meaning in a statute are to be
interpreted by their context and in view of the purpose
of the lawmaker.   The words we are now considering
have been interpreted by courts of other States when
used in a statute having reference to a particular pur-
pose.   In Words and Phrases, vol. 6, p. 5227, reference
is made to a case in Minnesota, in which the defendant
being under contract to furnish the plaintiff railroad
company depot facilities for its "passenger trains,'',
refused to allow the plaintiff to use the passenger de-
pot for its mixed trains, that is, trains composed of
freight cars and passenger cars, but the court held
that such a train was a "passenger train'' within the
meaning of the contract.   [Railroad v. Union Depot
Co., 68 Minn. 220, l. c. 223-4.]   And the same author,
vol 7, p. 6038, takes up the phrase "Regular Passenger
Train'' and refers to some Illinois cases in which that
phrase is considered in reference to the purpose of the

statute in which it is used, the most recent one of which is Railroad v. People ex rel., 175 Ill. 359, construing a statute that required railroad companies to stop "all regular passenger trains" at county seats to receive and discharge passengers. The railroad company ran a train called the "Knickerbocker Special" which it said "is not a regular passenger train carrying passengers from one point to another in Illinois, but is a special train engaged exclusively in interstate travel from points wholly without to points wholly within the State of Illinois; that no tickets are sold or passengers received on the train from points in Illinois to points in Illinois, and that it makes no stops except such as are necessary for fuel, water and railway crossings," etc. It was not questioned that that was a passenger train, but the question came on the meaning of the word "regular." It was not claimed by the able counsel for the railroad company in that case that the term "regular passenger train" had any well-established peculiar meaning in the parlance of railroad men, but it was earnestly insisted that the train then in question was a train put on to meet a certain interstate traffic demand, limited alone to interstate business, and in that sense was essentially a special and not a regular train. But the court turned to the statute and considered the purpose the lawmakers had in view in requiring trains to stop at county seats and concluded that that train came within the meaning of the phrase "regular passenger trains" for that purpose.

Since, therefore, there is no recognized technical definition of the phrase "regular passenger train" we must go to our statute and ascertain if we can what our General Assembly meant by it, in the Act of 1907, and if we cannot with reasonable certainty determine what it means we cannot convict a person or corporation of violating it.

The word "train" is used in reference to railroad traffic to mean all kinds of trains, freight train, pas-

senger train, mail train, construction train, etc., the character of the train is designated by a word. In the term "passenger train" the word "passenger" is used as an adjective to qualify the noun "train." The two words "passenger train" combine to form the name of the thing to which it is applied; neither word used alone would designate the object intended, but together they constitute the name. The word "regular" is designed to express the character of the train to which it is attributed. It signifies that it is a regular train, whether freight or passenger. Regular in what? The State contends that it means regular in its make-up—uniform in its composition; the defendant, contra, contends that it means a train running regularly on a prescribed published schedule, not an excursion train, not a special train for a single trip, not a wild train, but one that goes by the published card. We think the defendant's interpretation of the word is correct. The meaning of the word "regular" in this connection would be more apparent if we would use it in contrast with its opposite—irregular. When we hear a particular train spoken of and called an irregular train we have no difficulty in understanding what is meant by the term. It is a train that is not down on the regular list, it runs not on a published schedule, it gives the public no notice of its coming or of its purpose, or of whither it is going. We are satisfied that the word "regular" when used to designate a train applies to the operation of the train, it may be a freight train or it may be a passenger train, but if it has its designated place on the published schedule and if it ordinarily comes and goes in that place it is a regular train. Thus there may be two passenger trains, one regular and the other irregular, one that is down on the published time table and the other not, yet the irregular train is as much a passenger train as the regular one.

The answer to a question we have in this opinion above suggested, to-wit, what is the difference in the

significance of the terms "passenger train" and "regular passenger train?" is this, the term "passenger train" includes all passenger trains, regular and irregular, not only trains that move every day on schedule time, but excursion trains, special trains, extra trains, etc., whereas the term "regular passenger train" means a passenger train on the regular schedule list.

We have in another section of our statutes express recognition by the General Assembly that a passenger train may carry freight cars—section 1101, Revised Statutes 1899, Ann. Stat. 1906, p. 938: "In forming a passenger train, baggage, freight, merchandise or lumber cars shall not be placed in rear of passenger cars." In the train in question in this case the freight cars were not placed in rear of the passenger cars.

That it was the running and the operating of the train that the General Assembly had in mind when it used the word "regular" in this connection is indicated also in the closing sentence of the first section of the act: "which train shall stop at all regular stations along the line of such railroad for the purpose of receiving and discharging passengers."

This train complied with that requirement. The purpose of the act was to afford the travelling public railroad facilities at least once a day at regular times and at all the regular stations, not leaving the public to the whim or caprice of the railroad company whether it would send a train over its road on a particular day. If the General Assembly had seen fit to say that, in order to render the passenger service more agreeable and expeditious, the railroad company should carry no freight cars in the train it would have said so, or if it had seen fit to define what it meant by a passenger train we would have had no trouble with construing the act as we now have it; but it has been satisfied to say that the defendant must run "a passenger train," and we do not feel justified in saying that the defendant did not run a passenger train as the statute

State v. Railroad.

requires when the evidence shows that it furnished a train equipped as this was with an ordinary passenger coach furnishing facilities for the carrying of all the passengers (so far as the evidence shows to the contrary) that desired to be carried and their baggage in the usual way; nor can we say that it was not a regular passenger train when the evidence shows that it was run on regular schedule time and, so far as the evidence shows to the contrary, it stopped at all the regular stations to receive and discharge passengers. We hold that there was no evidence tending to show that the defendant violated the statute.

All the evidence in the case being the State's evidence, the court should have found the defendant not guilty as charged in the information. This conclusion disposes of the case before we reach the constitutional question concerning which much learning and ability has been shown in the briefs and in the oral arguments. But before this corporation can have our judgment on the question of the impairment of its religious liberty it will have to take off its Sunday train on that branch of its road and incur the wrath of State for so doing.

The judgment is reversed and the defendant is discharged.

All concur.