382 Mich. 8 (1969)
167 N.W.2d 438
CHESAPEAKE & OHIO RAILWAY COMPANY
v.
PUBLIC SERVICE COMMISSION.
CITY OF GRAND RAPIDS
v.
CHESAPEAKE & OHIO RAILWAY COMPANY.
Calendar No. 15, Docket Nos. 51,726, 51,727.
Supreme Court of Michigan.
Decided May 5, 1969.
Rehearing granted October 6, 1969.
Causes dismissed April 13, 1970.
*16 Paul C. Younger, Allan F. Schmaltzriedt, and John J. Holden, for Chesapeake & Ohio Railway Company.
Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, and Hugh B. Anderson and David P. Van Note, Assistant Attorneys General, for Attorney General and Public Service Commission.
Steven L. Dykema, City Attorney, for City of Grand Rapids.
Roger P. O'Connor, Assistant Corporation Counsel, for City of Detroit.
William J. Garlington, City Attorney, for City of Wyoming.
Jacob I. Alspector, for Railroad Brotherhoods.
Causes dismissed per stipulation and GCR 1963, 858, April 13, 1970.
ADAMS, J. (for affirmance).
1. The Facts and Proceedings.
In November 1964, the Chesapeake & Ohio Railway Company announced by public notification that effective January 3, 1965, it would discontinue operating *17 passenger trains Nos. 14 and 15, running daily except Sunday between Grand Rapids and Detroit. These trains were one of three pairs of trains in which the railroad carried passengers on runs between those cities, the additional trains being designated as Nos. 11 and 12 and Nos. 19 and 20.
Train No. 11 was made up of a diesel locomotive, one mail car, one diner, two streamlined coaches and one roadrailer. Train No. 12 was identical to No. 11 except that it carried three roadrailers. A roadrailer is described as a trucktrailer with both rubber tires and steel wheels. It is used to carry mail, express, and other commodities and is capable of being taken off the rails and transported to a post-office or other location. Train No. 14 matched No. 11 in equipment. Train No. 15 was identical with train No. 12. These four trains had operated on the following schedules since September 1, 1946:
Train No. 11. Lv Detroit 8:30 a.m. Ar Grand Rapids 11:35 a.m.
Train No. 12. Lv Grand Rapids 3:30 p.m. Ar Detroit 6:30 p.m.
Train No. 14. Lv Grand Rapids 7:30 a.m. Ar Detroit 10:30 a.m.
Train No. 15. Lv Detroit 5:20 p.m. Ar Grand Rapids 8:25 p.m.
All four trains made regularly scheduled stops at Lansing and Plymouth with a flag stop at Lake Odessa. Trains 14 and 15 made an additional flag stop at Howell.
Trains Nos. 19 and 20 began operating about June 1, 1960. The fact that the C & O could get a new mail contract with the Federal postal department was the primary reason for placing them into service. For some time prior to November 1964, the equipment of the two trains was identical consisting *18 of a diesel locomotive, one mail car, one streamlined combination baggage-passenger coach and six roadrailers. Train 19 was scheduled to leave Detroit at 11:40 p.m., arriving at Grand Rapids at 2:55 a.m. with a regular stop at Lansing. Train 20 left Grand Rapids at 11:10 p.m. arriving at Detroit at 2:20 a.m. with a stop at Lansing.
The legislature by the enactment of PA 1941, No 134, amended section 13 of the railroad regulation act (PA 1909, No 300) to add two new subsections, reading as follows:
"(c) Passenger service shall not be discontinued in this state without the permission of the commission and unless the railroad desiring to discontinue such service shall first file a petition with the commission, and hearing is held thereon as provided in section 22 of this act. The commission at such hearing shall inquire into the convenience and necessity of the service to the public and shall render its decision thereon. At any hearing upon such petition any person, association, corporation, municipality or governmental unit whose interests shall be adversely affected by the discontinuance of the service, may petition the commission for leave to intervene in said proceedings and participate therein as a party. If it shall appear to the commission from the state of said applicant's interests that said interests may be adversely affected by the discontinuance of service, the commission shall grant permission to intervene: Provided, however, That the provisions of this act shall not apply to the revision of passenger service schedules, the consolidation of passenger trains, temporary or seasonal trains, nor to any railroad operating more than 2 passenger trains in each direction on a week day on the portion of the railroad affected;
"(d) Any common carrier, or other party in interest, being dissatisfied with any order of the commission made under the provisions of this section, *19 shall have the same rights to appeal and review as provided under section 26 of this act, as last amended."
These added subsections remained unchanged until 1965. CL 1948, § 462.13 (Stat Ann 1963 Cum Supp § 22.32).
Following the November announcement of discontinuance of trains 14 and 15, on December 1, 1964, the Michigan public service commission gave notice of its intention to investigate. It held a public hearing on December 21, 1964. C & O filed a special appearance and motion to dismiss but the commission, basing its decision on a finding that trains 19 and 20 were not passenger trains within the meaning of the proviso clause of the statute, ordered the railroad to continue to operate trains 14 and 15 until it obtained approval for discontinuance.
Two separate lawsuits evolved from the commission's order: one, in the superior court of Grand Rapids brought by that city against the railroad company; the other, appeal by the railroad to the Ingham county circuit court. The public service commission, the attorney general, and the cities of Detroit, Lansing and Wyoming intervened in the Grand Rapids case. A temporary restraining order was issued prohibiting the railroad from discontinuing trains 14 and 15 without approval from the commission. The case was transferred to the Ingham county circuit court and assigned number 2856-C. The railroad's appeal had been designated as case No. 2758-C. Trial of the cases resulted in judgments on April 19, 1965: in case No. 2856-C denying the prayer for injunction and dissolving the temporary restraining order obtained by the city of Grand Rapids; and in case No. 2758-C temporarily restraining the commission from enforcing its order against the railroad company.
*20 Between the date of the filing of the trial judge's written opinion on April 7, 1965 and the entry of the judgments on April 19, 1965, the statute was changed by the passage of PA 1965, No 15, effective April 16, 1965, which amended the proviso clause to read: "The provisions of this act shall not apply to temporary or seasonal trains." CL 1948, § 462.13, as amended (MCLA § 462.13, Stat Ann 1969 Cum Supp § 22.32[c]).
On the date the amendatory act became effective, the public service commission filed motions to dismiss both cases on the ground that the issues had become moot. The motions were denied on April 22, 1965.
Appeals were taken in both cases to the Court of Appeals. Upon review, that Court ordered dismissal of case No. 2856-C for lack of jurisdiction and in case No. 2758-C vacated the commission's order with permanent injunction against its enforcement. 5 Mich App 492, 509.
Upon an application for leave to appeal being filed in this Court, the cases were remanded to the circuit court, by order entered June 8, 1967, for reconsideration in the light of Southgate v. State Banking Commissioner (1967), 379 Mich 1. The judgment of the Court of Appeals was stayed, the railroad being enjoined and restrained from discontinuing any of its passenger trains between Detroit and Grand Rapids during pendency of the proceedings and until further order of the circuit court.
June 19, 1967, the C & O filed a motion in the circuit court in case No. 2758-C to set aside the stay of proceedings previously issued by that court which would thereby reinstate the injunctive judgment against the public service commission entered on April 19, 1965.
*21 On July 3, 1967, the public service commission, joined by the intervenors, filed a motion for summary judgment in both cases. July 7, 1967, the circuit judge announced his opinion on remand, saying in part:
"The order of the Supreme Court in the case at bar, stays the judgment of the Court of Appeals and gives no instruction as to how the circuit court is to further handle the matter, other than what conclusion may be drawn from the statement, quote  `in light of Southgate Bank v. State Banking Commissioner.'
"It will be noted in the Southgate Case that the Supreme Court did not expressly vacate the judgment however, this conclusion was drawn by the author of the synopsis in volume 379 Mich 1 at page 3.
"This court is unable to make such an assumption in this case because the Supreme Court's order specifically states that the Court of Appeals' decision is stayed. Unless this court receives further or different instructions from the Supreme Court it feels that it is bound by the Court of Appeals decision interpreting the amendment here in the case at 5 [Mich App] 492."
The motions for summary judgment were denied and the request to lift the injunction (stay) was also denied. An order was entered August 1, 1967 by the circuit judge stating his inability to comprehend the order of remand by this Court so as to comply with it. The case was transmitted to the Supreme Court by the circuit court clerk on August 16, 1967 and returned without comment on September 25, 1967 to the circuit court. The circuit judge in an opinion filed November 8, 1967, believing himself bound by the decision of the Court of Appeals, determined that the railroad was entitled to discontinue the trains.
*22 Judgment was entered by the circuit judge in case No. 2758-C on November 17, 1967 setting aside the commission order of December 23, 1964 and permanently enjoining the commission from interfering with the discontinuance of the trains. On the same date, judgment was entered in case No. 2856-C dismissing plaintiffs' complaint.
An order was entered November 17, 1967, suspending judgment in both cases for a period of seven days pending appeal. The previous day the commission, joined by the city of Grand Rapids and the other intervening plaintiffs, had filed a motion in the Supreme Court seeking a remand to circuit court for entry of orders granting the motions for summary judgment. A motion for emergency stay and injunction was filed and granted. This Court considered the motion to remand as an application for leave to appeal from the decision of the Court of Appeals and the orders of the Ingham county circuit judge and granted such application with Justice O'HARA dissenting. 380 Mich 752.
2. The Effect of PA 1965, No 15.
PA 1965, No 15, narrowed the exemption appearing in the proviso clause of the old law by limiting it to "temporary or seasonal trains" thereby conferring jurisdiction on the commission over discontinuance proposals for all other types of passenger service. The obvious purpose of the act was to remove from a railroad the right to discontinue some portion of existing passenger service without the necessity of obtaining prior commission approval. If Act 15 applies, all other issues become moot because commission approval to discontinue trains 14 and 15 has not been obtained.
The legislature ordered that PA 1965, No 15, take immediate effect. It gave no indication, however, *23 of an intention to apply its provisions retroactively to control action by a railroad company already initiated to discontinue some portion of its passenger service. The rule of statutory interpretation in this State as to retroactive application of legislation is that the legislative intent must be clearly and unequivocally expressed. Finn v. Haynes (1877), 37 Mich 63; Detroit Trust Co. v. City of Detroit (1934), 269 Mich 81; In re Davis' Estate (1951), 330 Mich 647; Melcher v. Employment Security Commission (1952), 335 Mich 122; Briggs v. Campbell, Wyant & Cannon Foundry Company (1967), 379 Mich 160.
Prior to the effective date of PA 1965, No 15, the public policy of this State, as expressed in the proviso clause of section 13(c), added by PA 1941, No 134, was that the public convenience and necessity would be satisfied by the operation of two passenger trains in each direction on a week day and any regulatory jurisdiction of the commission did not extend to discontinuance of passenger service so long as this minimal requirement was met. The change in the State's public policy by the enactment of PA 1965, No 15, abridged the prior substantive right of the railroad company to preserve its property and reduce expense by curtailing or abandoning unprofitable passenger service without commission intervention so long as "more than 2 passenger trains in each direction on a week day on the portion of the railroad affected" were operated. The nature of the railroad's interest distinguishes this case from Southgate, supra. In Southgate it was said (p 4):
"A majority of the Justices find themselves in agreement with the attorney general's position that the legislative history as well as the wording of former section 39 of the financial institutions act *24 (CL 1948, § 487.39 [Stat Ann 1957 Rev § 23.767]) lead necessarily to conclusion that the legislature intended from the beginning to permit a change of location of the main office of a bank only with the banking commissioner's approval, subject of course to the right under section 21 of judicial consideration and determination de novo. Decision nevertheless is planted upon unanimous view that the 1966 amendment, effecting as it does clear requirement of administrative approval, calls for vacation of both judgments below with remand for reconsideration in circuit of all presented issues in the light of that amendment. To this we add firm determination that no right in property is involved and that the plaintiff bank had before  as well as now  no vested right to a change of location of its main office."
There being no specific legislative expression of intent to make the act retroactive and, further, any such retroactive application being of dubious validity, PA 1965, No 15, can only be applied prospectively from the effective date, April 16, 1965. We confess error in our remand of these cases to the trial court. Southgate is not controlling.
3. The Jurisdiction of the Public Service Commission.
Appellants argue that even if the 1965 amendment is inapplicable, the commission still had jurisdiction because of the factual determination made by it that C & O trains 19 and 20 were not passenger trains within the meaning of the proviso clause of section 13(c). Appellee counters that the commission erred as a matter of law in determining that the trains were not passenger trains.
The legislature did not define passenger trains. The trial court and the Court of Appeals each determined that trains 19 and 20 were passenger *25 trains. 5 Mich App 492, 507. No decision by this Court has been cited or found that disposes of the issue.
In a number of cases the status of "passenger" was not solely determined by the type of equipment making up the train. In Moore v. Saginaw, Tuscola & Huron Railroad Co. (1897), 115 Mich 103, plaintiff was described as a passenger while awaiting passage in the way-car of defendant's freight train; similarly described, in Stoody v. Detroit, Grand Rapids & Western Railway Co. (1900), 124 Mich 420, while riding in the caboose of a mixed train; and in the caboose of a freight train, Frohriep v. Lake Shore & Michigan Southern Railway Co. (1902), 131 Mich 459. In Van Auken v. Michigan Central Railroad Co. (1914), 182 Mich 331, plaintiff's decedent was found not to be a passenger but a bare licensee while being given free transportation in the caboose of a logging train. The Court refused to hold plaintiff was not a passenger, on a showing that he was a farmer riding on a miners' train running between the city and a mine and that he turned in a miner's ticket which was not good if detached. Perz v. Pere Marquette Railway Co. (1924), 226 Mich 452.
Commissioner of Railroads v. Wabash Railroad Co. (1900), 123 Mich 669, is perhaps even more directly in point. The case involved a dispute over the inclusion of mail and express receipts in gross earnings for the purpose of applying a statutory maximum passenger rate based on gross earnings of passenger trains. Justice GRANT, writing for a unanimous court, said (p 671):
"A passenger train consists of its passenger, baggage, express and mail cars. It would do violence to the plainest rules of construction to hold that *26 its gross earnings did not include the receipts from each source of income."
An Illinois statute required "all regular passenger trains" to stop at the railroad station of county seats to receive and let off passengers. An action was brought against the Chicago & Alton Railroad Company for failure to stop one of its passenger trains at the station in Carrollton. The company was operating three passenger trains through Carrollton each way daily. Two of the trains stopped at the station, but the other, known as the "Kansas City Express," made no stop except on Sundays. The supreme court of Illinois in Chicago & A.R. Co. v. People, for the use of Pierson (1883), 105 Ill 657, reasoned as follows (p 659):
"Indeed, the only difference between this and the other passenger trains on the road was, that the other two stopped at all the stations while this did not. On account of this difference, can the train, within the meaning of the statute, be regarded other than a regular passenger train? We think not. The language of the act would not, perhaps, include a wild train, a freight train, an excursion train or a special train; but where a train was engaged in carrying passengers, running regularly every day upon an advertised time card of the company, equipped as all other passenger trains are, we are satisfied such a train was designed by the legislature to fall within the terms of the act, `all regular passenger trains.' Had the legislature intended to except a fast train or a through train from the operation of the law, it would have been an easy matter to have framed the law in such a way that no doubt could have existed in regard to the intention, and if such had been intended, language of a different character would no doubt have been used."
A Missouri statute required railroads to run at least one regular passenger train each way daily *27 over all lines or parts of lines within the State and provided a criminal penalty for each violation. In State v. Missouri Pacific Railway Co. (1909), 219 Mo 156 (117 SW 1173), the charge against the railroad was described by the court in these words (p 163):
"Here then we have a train equipped with an ordinary passenger coach and also a car divided into compartments, designed to carry baggage in one compartment, mails in another and passengers in another, and the train running on a published schedule as to time, but in addition to those cars the train contained two or more freight cars and that fact alone is what the State relies on to prove that this was not a regular passenger train. The question therefore is, does that train fill the requirements of the Act of 1907, is it a regular passenger train, or, reducing the question to its simplest form, is it a passenger train?"
The Court supplied the answer by saying (p 168):
"The purpose of the act was to afford the traveling public railroad facilities at least once a day at regular times and at all the regular stations, not leaving the public to the whim or caprice of the railroad company whether it would send a train over its road on a particular day. If the general assembly had seen fit to say that in order to render the passenger service more agreeable and expeditious, the railroad company should carry no freight cars in the train it would have said so, or if it had seen fit to define what it meant by a passenger train we would have had no trouble with construing the act as we now have it; but it has been satisfied to say that the defendant must run `a passenger train,' and we do not feel justified in saying that the defendant did not run a passenger train as the statute requires when the evidence shows that it furnished a train equipped as this was with an ordinary passenger *28 coach furnishing facilities for the carrying of all the passengers (so far as the evidence shows to the contrary) that desired to be carried and their baggage in the usual way; nor can we say that it was not a regular passenger train when the evidence shows that it was run on regular schedule time and, so far as the evidence shows to the contrary, it stopped at all the regular stations to receive and discharge passengers. We hold that there was no evidence tending to show that the defendant violated the statute."
In State v. Gladson (1894), 57 Minn 385 (59 NW 487), affirmed 166 US 427 (17 S Ct 627, 41 L Ed 1064), defendant was convicted of failing to stop the train, which he was operating as locomotive engineer, at Pine City, a county seat, contrary to the statute requiring all railroads to stop all regular passenger trains at all county seats. The train was a fast express from St. Paul-Minneapolis to Duluth. The Court held that the fact the train carried the United States mail in addition to passengers did not void the statutory regulation and upheld defendant's conviction.
The public service commission sought to justify its conclusion that trains 19 and 20 were not in fact passenger trains by reciting that the motive which prompted C & O management to place passenger-carrying equipment in the makeup of trains 19 and 20 was not to attract passenger revenue but to save on train crew wages through fewer operating personnel than would be required on a freight and to provide a place for the train crew to ride since trains 19 and 20 were being operated too fast to permit the use of a caboose with safety. The commission noted: the passenger revenues earned during the first 10 months of 1964 by trains 19 and 20 were substantially less than the passenger revenues earned in the same period by trains 11 and 12 and *29 14 and 15; the absence of ticket sellers in the railroad stations at the time trains 19 and 20 made their scheduled runs; and the necessity for passengers to carry their own luggage.
Finally, the commission found that even though trains 19 and 20 were passenger trains, it still had jurisdiction because "the railroad has failed to show that such trains are not seasonal trains, and therefore not properly to be considered as part of the two passenger trains in each direction." It took the position that the burden was on the railroad to show affirmatively that the trains were not seasonal trains. Testimony was elicited that some people who attended night baseball games in Detroit preferred to use the trains to get home rather than staying over. The commission found "the passengers, if any, for whom the passenger car was added to trains 19 and 20 were primarily persons returning from Detroit baseball games in the summer." The commission concluded that this condition, coupled with the railroad's refusal 12 days prior to the December 1964 hearing to furnish by months the number of passengers and the passenger revenues for the preceding year on trains 19 and 20, justified its decision that trains 19 and 20 could not qualify as passenger trains.
It could not be successfully contended that trains 19 and 20 were excursion trains. The record shows them to be operating all year on a regular schedule. These facts likewise remove the trains from a seasonal classification. Based upon the reasoning of the foregoing cases, we conclude that the type of equipment available for passenger use the year around plus the holding out of a regularly scheduled passenger service was adequate to constitute trains 19 and 20 passenger trains within the meaning and intent of the proviso clause of section 13(c) *30 as it stood under PA 1941, No 134. Consequently, the C & O would be operating more than two passenger trains in each direction on a week day on the portion of the railroad to be affected by the discontinuation notice published in November 1964. The commission erroneously determined the meaning of the words "passenger trains." The provisions of the act do not apply.
Since the act does not apply, it is unnecessary to discuss the issue as to whether the C & O was obliged to exhaust its administrative remedies by petitioning the commission for permission to discontinue passenger trains 14 and 15 prior to seeking judicial relief.
ADDENDUM.
The rules of statutory construction quoted by Justice KELLY from his opinion in Northville Coach Line, Inc., v. City of Detroit (1967), 379 Mich 317, 329, 330, as he in that case states, were drawn from Grand Rapids Motor Coach Co. v. Public Service Commission (1949), 323 Mich 624.
In Grand Rapids Motor Coach, plaintiff sought an injunction against enforcement of a public service commission cease and desist order. The Motor Coach Company had extended its Grand Rapids operations to serve employees of industrial plants located in adjoining Wyoming township but within 2 miles of the Grand Rapids city limits. No application was made to the defendant commission for a certificate of convenience and necessity, the company claiming to be exempt from the motor carrier act. The commission's cease and desist order prevented plaintiff from operating in Wyoming township. Grandville-Wyoming Transit Company, holder of a certificate of public convenience and necessity from the commission for operations *31 in Wyoming township, intervened, claiming exclusive rights.
The statutory provision there involved was of PA 1933, No 254, art 5, § 2, as amended by PA 1943, No 41 (CLS 1945, § 11352-37, Stat Ann 1947 Cum Supp § 22.567). The pertinent provision read as follows:
"This act shall not apply to:
"(a) Vehicles operated entirely within any city or village of this state; nor to motor carriers of passengers whose local operations may extend a distance of not to exceed 2 miles beyond the boundary of such city or villages in which such local operations are wholly carried on, provided such extension shall not be to or into another city or village."
In determining the purpose of the statute as a whole, the Court said (p 636):
"The statute as a whole is designed to control the use of the highways and also to guarantee to the public, as a whole, adequate facilities for travel and at the same time to insure to them adequate service by public carriers of passengers."
As for the statutory exemptions, the Court said (p 637):
"Thus it is clear from a reading of all these exemptions and especially that in subparagraph (a), which is involved in this case and before us for construction, that the act contemplates that some operations of a carrier will not be regulated even though the carrier itself is so regulated as to certain of its operations. Thus a carrier of passengers which operates between 2 or more cities must obtain a certificate from the commission and submit to regulation by that body, but if it should at the same time also operate a motor coach service entirely within any city under a franchise from that *32 city, such operations would be exempt from regulations by the commission under the first clause of section 2(a), which exempts from the operation of the statute vehicles used wholly within any city or village. Therefore, a single carrier would be engaged in both regulated and unregulated operations at the same time under the provisions of this statute. For that reason the argument advanced on behalf of intervening defendant that a carrier cannot be both a regulated and nonregulated carrier is untenable for under the unquestioned and clear provisions of this statute it is permitted and contemplated."
The Court held in that case that the plaintiff's bill of complaint for an injunction against the enforcement of a cease and desist order entered by the public service commission should not have been dismissed. The language of the statute was construed to permit plaintiff an exemption upon the facts stated in the bill, the Court saying (p 640):
"The operation of the plaintiff company, a motor carrier of passengers, can only be carried on through its vehicles. The operation of the vehicles makes it a motor carrier, and to exempt the vehicles is to exempt the operations of the carrier the same as to exempt the operation of the carrier is to exempt its vehicles." (Emphasis added.)
In the present case, the proviso contained in PA 1941, No 134, reads as follows:
"The provisions of this act shall not apply to the revision of passenger service schedules, the consolidation of passenger trains, temporary or seasonal trains, nor to any railroad operating more than 2 passenger trains in each direction on a week day on the portion of the railroad affected." (Emphasis added.)
*33 Under the first test in Northville, this language is clear and unambiguous.[*] There can be no doubt as to the meaning of the statement that the provisions of the act do not apply. Consequently, I am unable to read into the proviso the convenience and necessity test contained in the body of subsection (c). The test does not apply because the proviso says it does not.
As to the second test in Northville, I agree that the exceptions should be carefully scrutinized. Under the proviso, if the C & O had elected to revise the time schedules for trains Nos. 11, 12, 14 and 15 so that the trains operated on schedules between midnight and 6 o'clock a.m., it was free to make such a revision. If, instead of operating on a year-around schedule, a train operated only during the summer months to serve baseball fans or to carry tourists north, the train could have been discontinued under the plain terms of the proviso. The convenience and necessity of the public would have no bearing on the railroad's right to act in either of the above situations.
As to the third and fourth tests  (3) the purpose of the statute, and (4) consideration of the act as a whole  it must be borne in mind that the legislature did not undertake to regulate the discontinuance of passenger service in this State until 1941. When it did, certain operations were specifically exempted. Passenger service schedules could be revised, passenger trains could be consolidated, temporary or seasonal trains serving resort areas or sporting events on a temporary rather than a year-around basis could be discontinued and, finally, a railroad could discontinue a passenger train if it were operating *34 more than two passenger trains in each direction on a week day on the portion of the railroad affected. It would seem quite clear that, because the legislature was undertaking regulation in a wholly new area of railroad operations  passenger service  it determined initially to leave unregulated some phases of such service which it deemed nonessential to the public convenience and necessity. The right of the railroad to do each of the acts stated in the proviso is determined by the act in question and not whether the result will discommode or inconvenience the public. The railroads were given the same freedom of action in certain unregulated areas as was given to motor carriers in certain situations in Grand Rapids Motor Coach.
I agree with Justice KELLY that a railroad has no right to be free of regulation and consequently do not question the prospective regulatory effect of PA 1965, No 15. However, for the reasons previously stated, I believe the act is entitled to be given prospective effect only.
The judgment of the Court of Appeals is affirmed. No costs, a public question being involved.
DETHMERS and T.M. KAVANAGH, JJ., concurred with ADAMS, J.
KELLY, J. (for reversal).
I disagree with the conclusion of my Brother's opinion. I contend that either, or both, the 1941 amendment to the statute[1] or its 1965 amendment[2] conferred jurisdiction upon the Michigan public service commission (hereinafter *35 referred to as commission) to determine the issue presented in this appeal.

1. THE JURISDICTION OF THE PUBLIC SERVICE COMMISSION PRIOR TO THE 1965 AMENDMENT.
On January 12, 1965, the Chesapeake & Ohio Railway Company (hereinafter referred to as C & O) filed its complaint in the circuit court for the county of Ingham, alleging that "plaintiff brings this action against the Michigan public service commission under and in accordance with the statute in such case made and provided, to vacate and set aside an order of the commission dated December 23, 1964, notice of which was received by plaintiff on December 29, 1964."
The statute referred to provides in section 25:[3]
"all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie, lawful and reasonable,"
and in section 26:[4]
"In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be."
In its complaint, the C & O alleged that it has been operating since June, 1960, and is now operating three passenger trains in each direction on a week day on the portion of its railroad between Detroit and Grand Rapids, Michigan; that when it announced on November 5, 1964, it would discontinue *36 operating trains 14 and 15, the commission issued a notice of hearing on December 1, 1964,[5] ordering the C & O to appear before the commission on December 21, 1964, "fully prepared to present evidence and testimony concerning the matter in order that the commission can have full and complete information upon which to base appropriate action"; that the C & O appeared specially and moved to dismiss, claiming the commission lacked jurisdiction to hear the dispute.
It should also be noted that at the inception of the hearing the C & O made known that it would not give testimony on any other question or matter except the one as to whether trains 19 and 20 are passenger trains. At this hearing it presented one witness, namely, Mr. Buford G. Nash, its regional *37 manager for the northern division which includes the State of Michigan.
The complaint further alleged that on December 23, 1964, the commission issued an order forbidding plaintiff to discontinue trains 14 and 15 without an order from the commission; that the order of the commission requiring it to continue the operation of passenger trains 14 and 15 is in direct violation of the statute because the commission has no jurisdiction in the premises; that "plaintiff is currently operating its passenger service between Detroit and Grand Rapids at an annual loss in excess of $150,000, or thereabouts," and "the proposed discontinuance of trains 14 and 15 is designed to reduce that loss. To require of plaintiff the continued operation of said trains would constitute an irreparable injury and damage to plaintiff, for which plaintiff would be unable to compensate itself."
The complaint concluded with a prayer that the commission's order be vacated and set aside and that the commission be enjoined from enforcing the order.
The trial court granted intervention as party defendants to the city of Lansing, the city of Wyoming, the city of Detroit, and the Railroad Brotherhoods, and answers to the C & O's complaint were filed by the commission, the city of Detroit, and the Railroad Brotherhoods. The action instituted by the city of Grand Rapids was transferred to the Ingham circuit court, and the two actions were consolidated.
The commission's answer denied that the action was properly brought pursuant to the statute, for the reason that the opinion and order did not finally administratively adjudicate the rights of plaintiff but merely required that the C & O institute and participate in additional steps before the commission *38 prior to discontinuance of such trains, and the C & O, refusing, had not exhausted its administrative remedy in seeking to discontinue trains 14 and 15 prior to the commencement of action for judicial review; that the statute has reference only to the duty of a railroad to secure the approval of defendant commission prior to the discontinuance of passenger trains, and does not relate to the commission's power to hold hearings, make investigations, and issue orders; that trains 19 and 20, operating at approximately midnight between Detroit and Grand Rapids, are not passenger trains within the meaning of the statute, but are freight or mail trains, which only incidentally carry an insignificant number of passengers.
In regard to the C & O's reference to damages in its complaint, the commission answered by stating:
"Defendant has no information or knowledge sufficient to form a belief as to the truth or falsity of the allegation contained in paragraph 12 that plaintiff is annually losing in excess of $150,000 in the operation of its passenger service between Detroit and Grand Rapids, or whether the proposed discontinuance of trains 14 and 15 is designed to reduce that alleged loss, and therefore leaves plaintiff to its proofs,"
but "regardless of whether plaintiff is incurring a loss in the operation of trains 14 and 15, its overall railroad common carrier operations are profitable, having produced net income after taxes of upwards of 40 million dollars in the year 1964, a major portion of which was earned as a result of plaintiff's common carrier operations in Michigan."
The commission's answer concludes with the prayer that:
*39 "Plaintiff's complaint be dismissed with prejudice for failure to state a claim upon which relief can be given;
"Or, in the alternative, that defendant's opinion and order of December 23, 1964, be affirmed."
The city of Detroit stated in its answer:
"That the common council of the city of Detroit has authorized the corporation counsel of the city of Detroit to intervene in this cause on behalf of the city of Detroit.
"That the city of Detroit adopts the answer of the defendant, Michigan public service commission, as and for its answer."
The Ingham county circuit court confined the hearing to the pleadings and the commission's findings and order. In holding that trains 19 and 20 were passenger trains, the court stated:
"There appears to be no material distinction between plaintiff's trains 19 and 20 and plaintiff's other trains which are conceded to be passenger trains. * * *
"As to trains 19 and 20 it is clear that plaintiff has operated them on a regular schedule between Detroit and Grand Rapids for a period of upwards of four years; that passenger service time tables have been published and distributed to the public generally during this time concerning said trains; that 2535 passengers were carried thereon during the first 10 months of 1964 [being the 10 months previous to the hearing] with a revenue therefrom amounting to $9,500 and that there has been a continued `holding out' to the public that said trains offered passenger service. It seems clear from the foregoing that a bona fide passenger service has been and is being offered on trains 19 and 20, whether said service is secondary or incidental to any other reason for running said trains, and meets the *40 meaning of `passenger service' and `passenger trains' as used in the statute."
The only comment of the trial court in reference to the statutory provision that "The commission at such hearing shall inquire into the convenience and necessity of the service to the public and shall render its decision thereon,"[6] was confined to this one paragraph:
"With respect to `convenience and necessity' it must be said that while the number of persons transported on trains 19 and 20 have been relatively few in number nonetheless said passenger service effectively contributes to some extent to convenience and necessity. Concededly not as much as plaintiff's other trains but to some extent. The contribution expressly appears in one regard by the use of the service by persons attending night baseball games."
The Court of Appeals[7] quoted extensively from the commission's opinion, and we set forth the following excerpts therefrom:
"`We find that the railroad's original and continuing purpose in attaching a combination coach to trains 19 and 20 was and is to achieve savings in crew costs and to provide a place for trainmen to ride. The fulfilling of a public need for transportation service at midnight and the obtaining of passenger revenues were and are no more than secondary or incidental reasons for the addition of a combination coach to trains 19 and 20.
"`The passenger coach presently used on trains 19 and 20 is a combination passenger and baggage car, containing 28 seats instead of the more usual 56 seats. The combination car is ordinarily used only on trains 19 and 20, and no other coaches are *41 ordinarily used on such trains. Other equipments on trains 19 and 20 include a locomotive, a railway postal office, and six "roadrailers," which are mail cars capable of being pulled on the public highways by tractors. By way of contrast, trains 11 and 12, and 14 and 15 consist of a locomotive, mail car, diner, 2 or 3 passenger coaches, and 1 or 3 roadrailers.
"`During the first 10 months of 1964 [10 months preceding the commission's hearing] trains 19 and 20 handled 2,535 passengers and obtained passenger revenue of $9,500, an average of five passengers and $18 revenue per trip. * * *
"`The revenue derived from mail, express, and other commodities on trains 19 and 20 is at least 20 times that derived from the transportation of passengers. In our opinion, the number of passengers and the amount of passenger revenue on trains 19 and 20 are de minimis. * * *
"`The railroad provides no special facilities or services for passengers riding trains 19 and 20. Baggage may not be checked, but must be carried by the passenger himself into the combination car, and placed on a rack or seat. No ticket sellers or porters are on duty at the Detroit depot at or shortly before the time of departure of train 19. No ticket sellers or other attendants are on duty in Lansing after 8 p.m. No railroad personnel are present at Grand Rapids upon the arrival of train 19 to assist or receive passengers. However, a large number of employees are present at both the Lansing and Grand Rapids depots for the receipt and handling of mail in connection with train 19. In Grand Rapids, more than a dozen employees assist in the handling of mail arriving on train 19. In contrast, there are ticket sellers in Detroit, Lansing, and Grand Rapids, and porters at Detroit, to accommodate passengers taking the daytime trains.'"
*42 The Court of Appeals did not in any way challenge or dispute the commission's findings; did not discuss in any way the statutory provision that "The commission at such hearing shall inquire into the convenience and necessity of the service to the public and shall render its decision thereon," and approved the trial court's denial of the commission's request for "a trial on the merits with an opportunity to introduce further evidence."
Deciding trains 19 and 20 were passenger trains, the Court of Appeals stated that the words "passenger train" should "be construed according to their common meaning"; that "In Commissioner of Railroads v. Wabash R. Co. (1900), 123 Mich 669, 671, it was held that a passenger train consisted of its passenger, baggage, express, and mail cars"; "that a passenger train is a train which is available for and actually used to carry passengers from among the general public on a regular schedule and which is held out or advertised to the public as such"; that the commission found that "trains 19 and 20 were not used for carrying freight, had been in operation on a regular schedule since June of 1960, and were continually available for and actually did carry passengers, although at hours not likely to promote their use."
In the opinion to which I dissent, Justice ADAMS accepts the Court of Appeals' reasons as to why trains 19 and 20 are passenger trains, and, in addition to those reasons, states that trains 19 and 20 are not seasonal trains.
The decision of the commission does not depend upon a finding that trains 19 and 20 were seasonal trains, but because Justice ADAMS has approved the seasonal train factor and because I view that point in a different way, I set forth with approval the commission's contention on this issue, as follows:
*43 "C & O took the position at the hearing that it was under no obligation to furnish the information that the commission requested, but would produce only those facts which `we believe would help the commission to its decision with respect to whether or not it had authority.'
"Although the commission, through its counsel, had also 12 days prior to the hearing requested C & O to provide a monthly breakdown of its passengers and passenger revenues for the preceding year on trains 19 and 20, to assist it in determining whether these trains were `seasonal trains' within the meaning of section 13, subd (c) of the railroad commission act, C & O refused to provide that information, although it admitted that it necessarily had the information available to it on a monthly basis in order to compute the total passenger revenues for the preceding year. * * *
"We can only infer from the railroad's refusal to provide a monthly breakdown of the number of passengers on trains 19 and 20 that such a breakdown would show a seasonal pattern in patronage of the trains, with the vast majority of the riders concentrated in the summer months, and particularly on days of night baseball games in Detroit." (Emphasis ours.)
Such an inference is justified under our well established ruling[8] that failure to produce evidence within a party's control raises the presumption that if produced it would operate against him, and every intendment will be in favor of the opposite party.
The record discloses protests from several cities to the proposed discontinuance of trains 14 and 15 which had rendered, evidently, satisfactory service since 1946, but does not record any request that the *44 midnight trains 19 and 20 be added to the schedule in 1960.
The following brief summary as to how the contemplated change would affect Grand Rapids, Plymouth, Howell and Lake Odessa, brings into focus the reasons for the protest, the reasons why trains 19 and 20 averaged only five passengers per trip, and why the change was contemplated without consideration of the "convenience and necessity" of passengers.
The Grand Rapids passenger desiring to spend a day in Lansing or Detroit could board train 14 at 7:30 in the morning, arrive in Lansing at 8:45 a.m., and in Detroit at 10:30 a.m. Then toward evening could board train 15 at 5:20 p.m., arrive in Lansing at 7:12 p.m., and in Grand Rapids at 8:25 p.m.
The C & O asks that this service be traded off or exchanged for train 20 which leaves Grand Rapids close to midnight (11:10 p.m.), arrives in Lansing after midnight (12:50 a.m.), and in Detroit in the early morning (2:20 a.m.), with return to either Lansing or Grand Rapids on a train that leaves a few hours after arrival (8:30 a.m.), or the passenger could wait until 11:40 p.m. that night, arriving in Lansing at 1:45 a.m. and in Grand Rapids at 2:55 a.m.
Considering Plymouth, Howell, and Lake Odessa, the change would mean that the midnight trains 19 and 20 stop only in Lansing on their trips between Detroit and Grand Rapids, while the daytime trains make scheduled stops at Plymouth and flag stops at Howell and Lake Odessa.
Appellants refer to that part of the Court of Appeals' opinion which states: "It would seem that a passenger train is a train which is available for and actually used to carry passengers from among the general public on a regular schedule and which *45 is held out or advertised to the public as such," by saying:
"Applying that test, a freight train may be made a passenger train at the whim of the railroad, merely by permitting the general public to ride in the caboose, operating the freight train on a regular schedule (most freight trains are operated on regular published schedules), and publishing the fact that the train is available for use by passengers. And, indeed, for the purpose of some statutes, such trains have been held to be `passenger trains.' Or, the railroad, instead of providing a combination baggage car-passenger coach, with 28 seats for passengers, could provide a similar car with but two seats for passengers and the remaining portion given over to mail and baggage. If the history and purpose of the trains are irrelevant, as the circuit court and Court of Appeals apparently held, then it would be irrelevant if the combination car were added to the mail or freight train one week before the bona fide passenger train was to be discontinued, for the express, admitted, and sole purpose of circumventing the petition and hearing requirements of former section 13, subd (c). Thus, if section 13, subd (c) was to provide any real protection to the public, the total circumstances of any given train must be examined for the purpose of determining, in the light of the purposes of section 13, subd (c), whether such train is a `passenger train.'"
Developing this contention of the appellants that the words "passenger train" must be considered in reference to the legislative purpose involved, or the legal responsibility to be decided, and further because applying the test: "What, then, is commonly understood by the term `passenger train'?"[9] will not answer the question here involved, we analyze the *46 Michigan decisions presented in the C & O's brief and the opinions.
The case of Commissioner of Railroads v. Wabash Railroad Co. (1900), 123 Mich 669, is the only Michigan case on this issue referred to in the brief of the C & O and in the opinion of the Court of Appeals, and is also commented upon in Justice ADAMS' opinion. His statement in regard to this decision discloses how far it is removed from the question presented in this appeal.[10]
My Brother, after stating, "No decision by this Court has been cited or found that disposes of the issue," cites five Michigan decisions handed down between 1897 and 1924, and three decisions from other States,[11] and then states:
"Based upon the reasoning of the foregoing cases, we conclude that the type of equipment available for passenger use the year around plus the holding out of a regularly scheduled passenger service was adequate to constitute trains 19 and 20 passenger trains within the meaning and intent of the proviso clause of section 13 (c) as it stood under PA 1941, No 134. * * * The commission erroneously determined the meaning of the words `passenger trains.' The provisions of the act do not apply."
The five Michigan cases are not helpful in deciding this appeal as they only involved the question of a railroad's duty to safeguard from injury a passenger who was injured while riding in the caboose *47 of a freight train, or injured on a train restricted to carrying miners.
Appellants contend: "Both the circuit court and the Court of Appeals adopted a mechanical, dictionary approach to construing the phrase `passenger trains,'" and state:
"Although a number of cases cited by C & O in the courts below have held that any train that carries passengers is a `passenger train' for the purpose of various specific statutes and contractual arrangements, a number of other cases have held that the carriage of passengers on a regularly scheduled train does not ipso facto make a train a `passenger train' for all purposes."
The statutory provisions of other States, containing the words "passenger train," which have been brought to our attention do not aid in determining the legislative intent in the statute we now have under consideration.
We summarized rules of statutory construction in Northville Coach Line, Inc., v. City of Detroit (1967), 379 Mich 317, at pages 329 and 330, as follows:
"(a) That the Court is required to discover the legislative intent and that, if the language is of doubtful meaning, a reasonable construction must be given, looking to the purpose to be served thereby;
"(b) That the general rule, that exemptions are carefully scrutinized and not extended beyond their plain meaning, should be applied;
"(c) That the purpose shall prevail over the strict letter;
"(d) That the act as a whole must be considered and especially the intent of a section listing exemptions from the application of the act."
*48 A word or words in a statute "`takes color from its surroundings in the statute where it appears,'" and "derives meaning from the context of that statute, which `must be read in the light of the mischief to be corrected and the end to be attained.'"[12]
The section of the statute under consideration (PA 1909, No 300, § 13, subd [c], as added by PA 1941, No 134) consisting of four sentences and approximately 200 words, clearly expresses in the first two sentences that passenger service shall not be discontinued before the railroad files a petition with the commission and a hearing held by the commission, with a decision as to how such a discontinuance would affect "the convenience and necessity of the service to the public."
The next two sentences (three and four) provide how the right to intervene can be granted to "any person, association, corporation, municipality or governmental unit whose interests shall be adversely affected by the discontinuance of the service."
These four sentences completely set forth the legislative intent as to how and when a railroad can discontinue passenger service.
In the last sentence there is a proviso, or exemption, containing for the first time the words "passenger trains," and such proviso was inserted by the legislature to exempt the above provisions if the railroad operated two passenger trains that met the "convenience and necessity" provisions of service to the public.
We cannot agree with the contention of the C & O that the proviso clause in sentence four gives it the right to disregard the provisions of the preceding portion of the enactment, and my dissent is measured by the belief that too much emphasis has been *49 placed on the words "passenger trains" and not enough attention given to the more than 150 other words contained in the section, particularly, the "convenience and necessity of the service to the public" phrase.
In seeking court reversal of the commission's finding and order, the C & O is required by statute "to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable." Appellee has failed to meet that test.
We can only conclude that under PA 1909, No 300, § 13, subd [c], as added by PA 1941, No 134, the commission had jurisdiction, and its findings and order should be and are hereby approved.
2. THE EFFECT OF PA 1965, No 15.[13]
Justice ADAMS in deciding PA 1965, No 15, does not apply, states:
"The legislature ordered that PA 1965, No 15, take immediate effect. It gave no indication, however, of an intention to apply its provisions retroactively to control action by a railroad company already initiated to discontinue some portion of its passenger service. The rule of statutory interpretation in this State as to retroactive application of legislation is that the legislative intent must be clearly and unequivocally expressed."
Appellants insist:
"PA 1965, No 15, being remedial in nature, should, if necessary, be construed as having retroactive application. However, as applied to C & O's passenger trains between Detroit and Grand Rapids, the statute *50 need not be given a retroactive construction in order to proscribe the discontinuance of such trains,"
and in support of this contention quotes from United States Supreme Court decisions as follows:
"A statute is not retroactive merely because it draws upon antecedent facts for its operation."[14]
"A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment."[15]
In concluding that the amendment does apply, we refer to our recent decision[16] holding that in determining legislative intent we are not confined to the language of the act but can and should consider the legislative history of the act.
The legislative history conclusively proves that PA 1965, No 15, was enacted because the legislature was aware of the C & O's announced intention to discontinue trains 14 and 15 and the enactment definitely provided that such a discontinuance could not be legally accomplished without the commission's consent.
Counsel for the C & O acknowledged in a brief filed with the Ingham county circuit court that the purpose and effect of the enactment would be to prohibit the discontinuance of C & O's trains 14 and 15, and the Court of Appeals acknowledged that the legislature acted because of present litigation, by stating (p 505):
*51 "This case is further complicated by the fact that the public service commission was successful in having rushed through the legislature PA 1965, No 15."
We quote with approval the following from appellant's brief:
"In the light of this legislative history, plus the actions of C & O and the statements of its counsel, there can be no question that the legislative purpose in enacting PA 1965, No 15 was to prohibit the discontinuance of any of C & O's passenger trains between Detroit and Grand Rapids without C & O first seeking and obtaining permission to do so from the Michigan public service commission."
In a very recent decision[17] we reaffirmed our holding in Rookledge v. Garwood (1954), 340 Mich 444, that:
"`An amendatory act has a repealing force, by the mechanics of legislation, different from that of an independent statute. Repugnancy is not the essential element of implied repeal of specifically amended sections. The rule is:
"`"Where a section of a statute is amended, the original ceases to exist, and the section as amended supersedes it and becomes a part of the statute for all intents and purposes as if the amendments had always been there." 25 RCL, Statutes, § 159, p 907. * * *
"`Nevertheless, the old section is deemed stricken from the law, and the provisions carried over have their force from the new act, not from the former. 1 Lewis' Sutherland Statutory Construction (2d ed), § 237.
"`It is plain from the authorities in this State and elsewhere that the effect of an act amending a specific section of a former act, in the absence of a saving clause, is to strike the former section from the *52 law, obliterate it entirely and substitute the new section in its place.'"
There is no "saving clause" in the amendment. The legislature has made it clear that PA 1965, No 15, should apply and we apply the amendment in determining the issue presented in this appeal.
Appellee claims that even though we do decide that the legislature intended the amendment should apply to this case, yet this Court cannot apply it because:
"The right of appellee to discontinue one passenger train each way without the permission of the commission was a vested interest subject to the due process clauses of both the Michigan Constitution, art 1, § 17, and Fourteenth Amendment, § 1, to the United States Constitution."
We shall continue this opinion by calling attention to provisions of the common law, statutory provisions, and United States Supreme Court decisions that disprove the C & O's vested right claims and prove that from the days of the formation of the C & O corporation, and other similar railroad corporations, a railroad's duties and public rights have been definitely established.
Munn v. Illinois (1876), 94 US 113 (24 L Ed 77), which has been a legal guidepost since 1876, establishes the railroad's duty to the public, as follows (pp 125, 126, 130):
"Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, *53 innkeepers, et cetera, and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. To this day, statutes are to be found in many of the States upon some or all these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property. * * *
"Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control. * * *
"Common carriers exercise a sort of public office, and have duties to perform in which the public is interested. * * * Their business is, therefore, `affected with a public interest.'" (Emphasis ours.)
A railroad has no right to be free of regulation or to be free of regulatory changes that impose new and additional burdens upon the railroad company.[18]
It is immaterial that the C & O changed its schedule of trains by adding the midnight trains 19 and 20 in 1960 prior to the effective date of PA 1965, No 15. A common carrier has no vested right to be free from a new or changed State regulation unless the State has guaranteed against a change by charter provision. The C & O has not and cannot claim such a charter provision. Without such charter protection, *54 the United States Supreme Court in Chicago, Burlington, and Quincy Railroad Co. v. Iowa (1876), 94 US 155, 161, 162 (24 L Ed 94), said:
"Railroad companies are carriers for hire. They are incorporated as such, and given extraordinary powers, in order that they may the better serve the public in that capacity. * * *
"It is a matter of no importance that the power of regulation now under consideration was not exercised for more than 20 years after this company was organized. A power of government which actually exists is not lost by nonuser. A good government never puts forth its extraordinary powers, except under circumstances which require it. That government is the best which, while performing all its duties, interferes the least with the lawful pursuits of its people."
We conclude that the application of the 1965 amendment to the present appeal does not deprive appellee of a vested right.
Appellee states:
"The legislature recognized that two passenger trains each way daily met ordinary public requirements but encouraged railroads to put on the third train and thereby give the public more passenger train service, by in effect guaranteeing them that one of the three trains could be discontinued without commission approval."
"The State of Michigan tendered to any railroad then operating or which in the future might operate more than two passenger trains each way week days between two points in the State of Michigan the right to remove the excess above two trains each way without seeking the permission of the Commission. * * * [C & O] accepted this grant by the institution of passenger service on trains 19 and 20, thereby creating a contract between the State of Michigan and * * * [C & O], which is within the *55 provisions of the Constitution of the State of Michigan and the Constitution of the United States."
We find nothing in the statutes or in the record to sustain appellee's statement that "the legislature recognized that two passenger trains each way daily met ordinary public requirements but encouraged railroads to put on the third train."
The statement that "the State of Michigan tendered" and "[C & O] accepted this grant by the institution of passenger service on trains 19 and 20, thereby creating a contract between the State of Michigan and * * * [C & O]," is refuted by the record.
If there were a 1960 tender, it was not by the State of Michigan, but by the United States postal authorities; and if there were an acceptance and contract, it was between the postal authorities and the C & O resulting in installing for the first time the midnight trains 19 and 20.
The only witness the C & O offered at the hearing before the commission was its regional manager (which area included Michigan), Mr. Nash, who testified:
"Q. If you had not obtained a contract with the post office for delivery of mail you would have never had 19 and 20 on the route as of now, would you?
"A. I would say that is absolutely correct. * * * Our obligation is to the post office to run these trains at approximately the times they are operated to provide the service for the United States mails.
"Q. The postal authorities require that the mail arrive at Detroit or Grand Rapids at approximately the time that your trains do in fact arrive there?
"A. That is correct.
"Q. And if you were to switch trains 19 and 20 to daytime operation for example you would lose your mail contracts?
*56 "A. I'm sure that we would. And additionally we'd probably lose our mail contract on the other trains also."
We conclude there was no contract agreement between the C & O and the State of Michigan, and applying PA 1965, No 15, does not impair the obligation of contract in violation of State and United States Constitutions.[19]
3. CONCLUSION.
The parties to this litigation disagree as to what has been presented to this Court for decision and as to the method of determination this Court should adopt.
Appellants claim that appellee's failure "to exhaust its administrative remedies" results in a record that precludes judicial determination of appellee's claimed right to discontinue trains 14 and 15, and states that if appellee follows the statutory requirement[20] and, "if C & O seeks such a certificate, and the commission grants it, the Court will not then be called upon to resolve the substantive issue raised by the C & O case at bar. Should the commission deny a certificate to discontinue trains 14 and 15, then the jurisdictional issues could be properly presented to the Court at that time."
Appellants stress this point by stating:
"The wisdom of the rule that administrative remedies must be exhausted prior to seeking judicial intervention has been seldom more clearly demonstrated than in this very dispute, where C & O's refusal *57 to complete the administrative process has resulted in three lawsuits in five courts, with two of the cases having been in two of the courts twice."
Appellee expresses a different opinion, stating:
"The Court may disregard the finding of the commission and make an original finding of its own on jurisdiction; it may, if it sees fit, find the facts the opposite to the finding of the commission. * * *
"This is a proper case for the Court to make an original finding on the question of jurisdiction. Indeed, if the Court is to make any finding at all, it must be an original finding for the simple reason that the Michigan public service commission finding is based upon a misunderstanding of the law, a misunderstanding of the definition of a passenger train."
We regret that the extensive hearings conducted prior to the appeal to this Court have resulted in a record that causes the appellee to admit that if this Court "is to make any finding at all, it must be an original finding." This unfortunate status of the record was caused by the C & O's refusal to follow the procedure set forth in the statute and its repeated resistance to the commission's efforts to obtain the facts in re trains 14 and 15 and 19 and 20, both at the commission hearing and at the proceedings in the Ingham county circuit court.
The record discloses that appellee confined its proof to one witness, who, under C & O orders, only answered questions the C & O deemed pertinent to the jurisdiction. Nothing in the record would justify our finding that the facts were "opposite to the finding of the commission."
The statute granting appellee the right to seek judicial review of the commission's order provides that the court should not grant the relief sought unless appellee shows "by clear and satisfactory evidence *58 that the order of the commission complained of is unlawful or unreasonable."[21]
Finding no clear and satisfactory evidence that the commission's order was unlawful or unreasonable, we find that the commission had jurisdiction, and affirm the commission's order. Judgments of the Court of Appeals should be reversed.
Nothing in this opinion precludes appellee from future proceedings in conformity with the statute.
No costs, a public question being involved.
T.E. BRENNAN, C.J., and BLACK, J., concurred with KELLY, J.
T.G. KAVANAGH, J., took no part in the decision of this case.
NOTES
[*] See Justice DETHMERS' comment as to similar language in Motor Coach:

"`(1) This act shall not apply to:' Plainer language could not have been used."
[1] PA 1909, No 300, § 13, as amended by PA 1941, No 134 (CL 1948, § 462.13 [Stat Ann 1963 Cum Supp § 22.32]).
[2] PA 1965, No 15 (MCLA § 462.13 [Stat Ann 1969 Cum Supp § 22.32]).
[3] CL 1948, § 462.25 (Stat Ann § 22.44).
[4] CLS 1961, § 462.26 (Stat Ann 1969 Cum Supp § 22.45).
[5] "It is ordered that * * * an investigation * * * and a public hearing be held for the purpose of ascertaining if:

"1. There is a demand for the continuation of trains 14 and 15.
"2. Trains 14 and 15 serve the least need to the traveling public along this route as evidenced by passenger usage figures.
"3. The Chesapeake & Ohio has attempted to stimulate and develop its passenger service in recent years.
"4. An upward or downward revision of fare schedules would produce an increase in net revenue.
"5. The present schedule of Detroit to Grand Rapids trains discourages patronage.
"6. The opening of I-96 is affecting the traffic potential for passenger service between Detroit and Grand Rapids.
"7. The recent passenger trend indicates an impending stabilization of patronage.
"8. Trains 14 and 15 are netting the Chesapeake & Ohio the least amount of revenue of the passenger trains operating between Detroit and Grand Rapids.
"9. Savings of $70,000 will be realized by the Chesapeake & Ohio if Trains 14 and 15 are discontinued.
"10. The Chesapeake & Ohio is obtaining sufficient revenues on its overall Michigan operations, especially from the Detroit, Lansing and Grand Rapids areas to warrant retention of its present passenger service.
"11. Trains 19 and 20 are, in fact, passenger trains. (Train 19 leaves Detroit at 11:40 p.m. and arrives in Grand Rapids at 2:55 a.m. Train 20 leaves Grand Rapids at 11:10 p.m. and arrives in Detroit at 2:20 a.m.)
"12. There are any other factors which may have a bearing on this matter."
[6] CL 1948, § 462.13 (Stat Ann 1963 Cum Supp § 22.32).
[7] Chesapeake & Ohio Railway Co. v. Public Service Commission (1967), 5 Mich App 492, 498, 499.
[8] Brandt v. C.F. Smith & Co. (1928), 242 Mich 217; In re Petition of Upjohn (1931), 256 Mich 181; Laughlin v. Michigan Motor Freight Lines (1936), 276 Mich 545; Grigg v. Hanna (1938), 283 Mich 443; Leeds v. Masha (1950), 328 Mich 137, and Barringer v. Arnold (1960), 358 Mich 594.
[9] Court of Appeals opinion, p 507.
[10] "The case involved a dispute over the inclusion of mail and express receipts in gross earnings for the purpose of applying a statutory maximum passenger rate based on gross earnings of passenger trains."
[11] Chicago & Alton R. Company v. People, for the use of Pierson (1883), 105 Ill 657; State v. Missouri Pacific Railway Co. (1909), 219 Mo 156 (117 SW 1173); State v. Gladson (1894), 57 Minn 385 (59 NW 487), affirmed 166 US 427 (17 S Ct 627, 41 L Ed 1064).
[12] National Labor Relations Board v. Hearst Publications, Inc. (1944), 322 US 111, 124 (64 S Ct 851, 88 L Ed 1170).
[13] This act amended PA 1909, No 300, § 13, subd (c), as added by PA 1941, No 134 (CL 1948, § 462.13 [Stat Ann 1963 Cum Supp § 22.32]).  REPORTER.
[14] Lewis v. Fidelity & Deposit Co. of Maryland (1934), 292 US 559, 571 (54 S Ct 848; 78 L Ed 1425; 92 ALR 794). See, also, Cox v. Hart (1922), 260 US 427, 435 (43 S Ct 154; 67 L Ed 332).
[15] Reynolds v. United States (1934), 292 US 443, 449 (54 S Ct 800; 78 L Ed 1353).
[16] Southgate Bank v. State Banking Commissioner (1967), 379 Mich 1.
[17] Ballog v. Knight Newspapers, Inc. (1969), 381 Mich 527, 537-538.
[18] Stone v. Farmers' Loan & Trust Co. (1886), 116 US 307 (6 S Ct 334, 29 L Ed 636); Atlantic Coast Line R. Co. v. North Carolina Corporation Commission (1907), 206 US 1 (27 S Ct 585, 51 L Ed 933); Lake Shore & Michigan Southern R. Co. v. Ohio (1899), 173 US 285 (19 S Ct 465, 43 L Ed 702).
[19] US Const, Art 1, § 10; Mich Const 1963, art 1, § 10.  REPORTER.
[20] "Passenger service shall not be discontinued in this state without the permission of the commission and unless the railroad desiring to discontinue such service shall first file a petition with the commission, and hearing is held thereon as provided in section 22 of this act." CL 1948, § 462.13 (Stat Ann 1963 Cum Supp § 22.32).
[21] CLS 1961, § 462.26 (Stat Ann 1969 Cum Supp § 22.45).